IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KYRIE CAMPBELL,<br><br>    Defendant. | CRIMINAL ACTION NO.<br><br>1:17-cr-207-CAP-CMS |

## FINAL REPORT AND RECOMMENDATION

On August 15, 2017, a grand jury sitting in the Northern District of Georgia indicted Defendant Kyrie Campbell, charging him with bank robbery and brandishing a firearm during the commission of a violent crime in connection with the November 3, 2016 robbery of a PNC Bank in Lilburn, Georgia. [Doc. 46]. Presently before the Court is Campbell's Motion In Limine to Suppress Illegally Obtained Statements in which he challenges the admissibility of certain statements he allegedly made after his arrest. [Doc. 104]. On April 16, 2018, I held an evidentiary hearing on the motion. [Doc. 151, Transcript ("Tr.__")].

At the hearing, Lieutenant Timothy Allen of the Lilburn Police Department testified that on November 3, 2016, he was notified that a PNC Bank in Lilburn Georgia had been robbed and that a GPS tracker attached to the stolen money had tracked the robbers to the area where Lieutenant Allen was working. [Tr. at 6, 12].


Lieutenant Allen and another officer used the GPS information they were provided to locate the car carrying the money, and they followed the car into an apartment complex. [Tr. at 7]. As the car pulled into the apartment complex, two males jumped out of the car and fled on foot, leaving a woman, Benita Alveranga, sitting in the car. [Id.]. Lieutenant Allen testified that in an attempt to capture one of the fleeing suspects, he drove to the back of the complex where he saw Defendant Campbell coming out of the woods. [Tr. at 23]. According to Lieutenant Allen, Campbell matched the description given for the driver. [Tr. at 12-13, 23]. Lieutenant Allen got out of the car with his weapon drawn, ordered Campbell to the ground, and placed him in handcuffs. [Tr. at 12-13, 24-25].

Having been advised that the suspects were likely armed and that one had a backpack, Lieutenant Allen was concerned for his safety. [Tr. at 26, 28]. While he had Campbell on the ground, Lieutenant Campbell asked where the backpack was and why Campbell was running. [Tr. at 8, 25-26]. In response, Campbell stated, "I didn't know he was going to rob the bank." [Tr. at 8, 25-27]. Ultimately, Lieutenant Allen concluded that Campbell had neither a backpack nor a gun. [Tr. at 29]. Lieutenant Allen placed Campbell in the back of his patrol car and drove back to the location where the suspects' car was parked. They remained there for a while and then drove to the police station. [Tr. at 14]. Lieutenant Allen

testified that while Campbell was in his patrol car, Campbell stated at least two more times, "I didn't know the guy was going to rob the bank." [Tr. at 15-17, 27-28, 31-32]. The other fleeing suspect was not caught, nor was the money located.

Once they arrived at the police station, Campbell was placed at a table in the break room where he stayed for a couple of hours while they waited for the investigators to arrive. [Tr. at 18-19, 33]. During that time, Campbell was handcuffed, but he was allowed to use the restroom and eat pizza. [Tr. at 18-19]. Lieutenant Allen testified that during the time they were in the break room, he did not ask Campbell any questions, and he did not advise Campbell of his Miranda rights. [Tr. at 19, 36]. Campbell, however, was shown a Facebook photograph or video of Lenard Gibbs, the person who the officers believed was the other fleeing suspect; Campbell was asked to identify Gibbs from the Facebook page, which Campbell did. [Tr. at 34, 36, 40].

FBI Special Agent Ashton Charles also testified at the hearing. He testified that on the day of the PNC Bank robbery, he responded first to the bank and then later to the apartment complex where the suspects had fled the vehicle. [Tr. at 39]. Agent Charles testified that the officers quickly realized that the two suspects they had in custody (Campbell and Alveranga) did not have the money, and they used the GPS tracker information to identify a residence where they thought the money

was located.  The officers obtained and executed a search warrant for that residence.  [Tr. at 40-41].

After the execution of the search warrant, Agent Charles returned to the Lilburn Police Department to take statements from Campbell and Alveranga.  [Tr. at 42].  Agent Charles testified that he questioned Campbell in an interview room, that at the beginning of the interview, he administered <u>Miranda</u> warnings to Campbell, and that Campbell signed a form indicating his agreement to waive his <u>Miranda</u> rights.  [Tr. at 39, 43-44; Gov. Ex. 5].  Agent Charles also testified that from the time that Campbell signed the waiver until the conclusion of the interview approximately one hour later, no one made any threats against Campbell, no one put their hands on Campbell in any way, and Campbell's demeanor was "fairly calm."  [Tr. at 45-46, 49].  The interview, including Agent Charles's delivery of the <u>Miranda</u> warnings, was recorded both in audio format (Gov. Ex. 2) and in video format (Gov. Exs. 3, 4).  [Tr. at 47-48].

In his original two-page motion to suppress, Campbell argued that all statements he made should be suppressed because the officers never administered <u>Miranda</u> warnings to him. [Doc. 104 at 2].  Following the evidentiary hearing, Campbell perfected his motion via a post-hearing brief.  [Doc. 154].  In that brief, Campbell moves to suppress only the statements made to Lieutenant Allen before

4

he was given his <u>Miranda</u> warnings; he does not challenge the voluntariness of the recorded statement he gave to Agent Charles. [<u>Id.</u> at 2-5]. In its post-hearing response brief, the Government states that it does not intend to use Campbell's pre-<u>Miranda</u> statements to Lieutenant Allen during its case-in-chief. [Doc. 173 at 3].

Given the parties' positions, it appears that Campbell's perfected motion, which focuses exclusively on the pre-<u>Miranda</u> statements to Lieutenant Allen, is now moot. Accordingly, I **RECOMMEND** that Defendant Kyrie Campbell's Motion In Limine to Suppress Illegally Obtained Statements [Doc. 104] be **DENIED AS MOOT**.

I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**SO REPORTED AND RECOMMENDED**, this 7th day of September, 2018.

_____
CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE